CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
OCT 2 0 2005
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| AUGUST B. ELLIOTT, | ) |
| Plaintiff, | ) Case No. 7:03CV00627 |
| v. | ) |
| BLACKSBURG-VIRGINIA POLYTECHNIC INSTITUTE SANITATION AUTHORITY, and MICHAEL E. VAUGHT, | ) MEMORANDUM OPINION |
| Defendants. | ) By: James C. Turk<br>) Senior United States District Judge |

The plaintiff, August B. Elliott ("Elliott"), brought this lawsuit against the defendants, Blacksburg-Virginia Polytechnic Institute Sanitation Authority ("Sanitation Authority") and Michael E. Vaught ("Vaught") under 42 U.S.C. § 1983 for a violation of the plaintiff's First Amendment rights and for a claim of wrongful discharge under Virginia state law. This case is before the Court on a Motion for Summary Judgment brought by the defendants. The parties have filed supporting briefs and the Court heard oral arguments on October 11, 2005. For the following reasons, the defendants' motion for summary judgment on the First Amendment claim is **Granted**. Furthermore, the Court declines to exercise supplemental jurisdiction over the State Law claim and it is **Dismissed without prejudice**.

I.

The plaintiff, August B. Elliott, began his employment with the defendant, the Sanitation Authority, in April 1988. The Sanitation Authority is a local public authority created pursuant to

1

the Virginia Water and Waste Authorities Act. VA. CODE § 15.2-5100 *et seq.* Elliott was employed as a wastewater operator at the Sanitation Authority wastewater facility. Sanitation Authority employees, such as Elliott, were paid a salary based on a 40 hour work week. The employees recorded their hours worked on a time sheet that was posted in an office at the Sanitation Authority.

Elliott's immediate supervisor was the defendant, Michael E. Vaught. Vaught's duties and responsibilities as supervisor included managing the work shifts and vacation (and leave) time of his employees. Vaught was also responsible for evaluating the performance of his employees and had the discretion to terminate those employees whom he thought were not performing at an acceptable level or had violated workplace rules.

During the course of his employment at the Sanitation Authority, Elliott alleges that he witnessed and heard that Vaught misused the labor of the employees that Vaught supervised. It is alleged that Vaught ordered Sanitation Authority employees to work on Vaught's personal tasks, such as repairing Vaught's automobile or renovating his real property, when those employees were being paid by the Sanitation Authority to work at the wastewater facility. It is further alleged that Vaught would modify the timesheets that stated each employees hours worked, so as to conceal his misuse of Sanitation Authority labor.

Elliott did not think that Vaught's use of public employee labor for Vaught's personal affairs was appropriate. Elliott confronted Vaught on various occasions in relation to Elliott's dissatisfaction with his own work leave time issues. Exhibit 1, Elliott Deposition at 39. In response to Vaught's statement that Elliott "keep his own time," Elliott started to copy the employee work-hour timesheets and photograph Vaught's vehicles that Sanitation Authority

2

employees allegedly worked on, in order to gather evidence to support his claim that other employees received pay and leave for time they did not work, while Elliot's time and leave were miscalculated. *Id.* at 51 & 53-54. In his deposition, Elliott recounts three instances in which he confronted Vaught with his concerns. *Id.* at 39.

The first instance, date and time unspecified, Vaught, Elliott, and two other Sanitation Authority employees, Robbie Russell and Bobby Epperly, were in the incinerator building. *Id.* at 39. Elliott is unclear as to the primary concern of the meeting but he states that "it was something over some new equipment that they put in, I am thinking it was something over that." *Id.* at 41. Thus, the meeting began on the topic of a routine workplace-related issue. During the meeting, Elliott states that Vaught "told me I was nothing and this and that for two hours pretty much." *Id.* Elliot then states that at some point during the meeting, Vaught's diversion of labor was brought up. *Id.* at 42.

On a second occasion, date and time unspecified, Vaught and Elliott were in Vaught's office. *Id.* Elliott complained that Vaught was being unfair as to how Vaught treated him. *Id.* at 43. Elliott did not think it was fair that Vaught gave preferential treatment to other employees. The issue of Vaught's corrupt practices were brought up in the context of Elliott explaining to Vaught how he thought it was unfair that Vaught treated the employees that he used for personal purposes better than him. *Id.* Specifically, Elliott complained that Vaught allowed one employee to take leave time of six months with pay. *Id.*

On a third occasion, March 12, 2003, Elliott went into Vaught's office to speak to Vaught about his vacation time. *Id.* at 92. Elliott did not agree with Vaught's assessment of how much vacation time Elliott had accumulated. *Id.* The discussion ended without resolution and Elliott

3

Case 7:03-cv-00627-JCT   Document 21   Filed 10/20/05   Page 3 of 12   Pageid#: 303

left Vaught's office. Elliott was upset about the meeting and told fellow employees that he had been copying the timesheets that listed all Sanitation Authority employees' work hours, in order to gather evidence of Vaught's corrupt practices. *Id.* at 93. An employee that heard Elliott's admission immediately told Vaught.

Later that day on March 12th, Elliott had another confrontation with Vaught, at which time two other Sanitation Authority employees were present. Vaught confronted Elliott about the copying of timesheets. Elliott stated that he told Vaught that he was not copying any timesheets because he feared that Vaught would terminated him if he admitted the truth. *Id.* at 94. Then, Elliott alleges that Vaught told him that this might be the worst day of his life. *Id.* at 96. At some point during the day, Elliott states that he told another person that if he was terminated, he "was going to take somebody with me." *Id.* at 97. Elliott states that he intended to reveal Vaught's corrupt practices if he was terminated. *Id.* at 98. On March 14th, Elliott learned from Vaught that he was terminated for copying time sheets and for allegedly making threats to other employees. *Id.* at 98.

Subsequent to his termination, Elliott attempted to discuss Vaught's corrupt practices with two members of the Sanitation Authority's board. Id. at 36. This civil action ensued. Elliott claims that he was terminated in retaliation for attempting to bring Vaught's corrupt practices to light. This, Elliott states is a violation of his First Amendment right. In addition, Elliott claims he was wrongfully terminated under Virginia state law for his attempt to be a "whistleblower" of Vaught's corruption.

## II.

Upon motion for summary judgment, the Court must view the facts, and inferences to be

4

drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 236-37 (4th Cir. 1995). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The mere existence, however, of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. FED. R. CIV. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise present specific facts showing that there is a genuine issue of disputed fact for trial. *Id.* If the non-moving party fails to show a genuine issue of fact, summary judgment, if appropriate, may be entered against the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

### A.

To prevail on a First Amendment retaliation claim, the plaintiff must show that: (1) He engaged in protected expression regarding a matter of public concern; (2) His interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace; (3) He was deprived of a benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights; and (4) A causal relationship exists between his protected expression on matters of public concern and the loss of the benefit. *See Goldstein*

5

*v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-52 (4th Cir. 2000); *Huang v. Board of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990). The first three elements are questions of law. *Goldstein,* 218 F.3d at 352. The fourth element, causation, is a question of fact that will serve as a basis for summary judgment only in those instances when there are no causal facts in dispute. *Id.*

First, not all speech by public employees is protected by the First Amendment. *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 155-56 (4th Cir. 1992). Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000). In analyzing whether speech involves a matter of public concern, the Court considers the content, form, and context of the statement(s) at issue. *Id.* This is a subtle, qualitative inquiry in which the Court utilizes the content, form, and context of the statements as guideposts to the exercise of common sense, "asking throughout: Would a member of the community be truly concerned with the employee's speech?" *Goldstein*, 218 F.3d at 352-53.

The content of Elliott's statements would be a matter of public concern. The content of the speech at issue is a public concern when the speech seeks to bring to light actual or potential wrongdoing or breach of the public trust on the part of government employees. *See Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998) (quoting *Connick v. Myers*, 461 U.S. 138, 148, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). The general public would be interested in the portions of Elliott's statements that addressed Vaught's improper allocation of public employee labor for Vaught's own private use. There is no doubt that public corruption and misuse of taxpayer dollars for one individual's private gain would be a matter of public concern and immediately

6

draw the community's ire. *See, e.g., Robinson*, 160 F.3d at 190 (holding that speech addressing corruption in the use of public funds could be a public concern); *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988) ("This Court has held that speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection."). The content of the speech, however, is only one factor in determining whether speech is of a public concern; the form and context of the speech must also be examined.

The question arises as to whether the form and context of Elliott's speech, as a whole, would necessarily constitute a public concern. The defendants contend that the form of Elliott's speech was not of a public concern because Elliott only voiced his concerns about Vaught's misuse of public employee labor to Vaught and several Sanitation Authority employees. Elliott did not attempt to expose Vaught's corruption to any third-parties such as the media or private citizens outside the Sanitation Authority workplace. In fact, Elliott attempted to discuss Vaught's corruption with management above Vaught, the Sanitation Authority board members, only after Elliott was terminated. Furthermore, Elliott admits that revenge was a possible motivation of finally exposing Vaught's practices to persons other than Vaught and a few Sanitation Authority employees after Elliott was terminated. *See* Exhibit 1, Elliott Deposition at 97-98 (admitting that Elliott was going to "take down" Vaught if he was terminated). He never attempted to expose Vaught's corruption to a wider public audience before his termination. The fact that Elliott only revealed his knowledge of Vaught's practices to Vaught and a few others in the context of his disgruntlement with his own work situation argues against the assertion that he was acting as a concerned private citizen, rather than a public employee.

Whether Elliott did not make his views publicly known, however, does not totally

7

undermine the public concern encompassed in his speech. Indeed, public employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly. *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16, 99 S Ct. 693, 58 L. Ed. 2d 619 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."); *Goldstein*, 218 F.3d at 354; *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996). It is not inconsistent or irrational for Elliott's speech to be of a public concern even though Elliott decided to first address his concerns with Vaught. *See also Ceballos v. Garcetti*, 361 F.3d 1168, 1177 (9th Cir. 2004) ("Regardless of the form in which a government worker makes charges of corruption . . . such charges raise serious public concerns . . . ."). The form of the speech, however, is a factor to consider and the fact that Elliott primarily spoke only to Vaught weighs against his speech being a public concern.

Under this Circuit's precedent, however, the context of Elliott's statements tip the balance in favor of his speech as not being a public concern. The context of Elliott's statements about Vaught's practices make it clear that he was acting in his role as an employee concerned with his own work environment rather than as a private citizen concerned with corruption. *See Connick*, 461 U.S. at 147 ("We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."). Although the topic of Vaught's corruption would be of interest to the public, Elliott's statements regarding

8

the issue only arose in response to disagreements Elliott and Vaught had about Elliott's work and vacation time. Vaught's practices were no more than a peripheral issue that arose as an attempt by Elliott to justify why he thought Vaught was treating him unfairly.

In all three instances where Elliott brought up Vaught's diversion of labor, it was in discussions of his own unhappiness with his treatment by Vaught. During the meeting in the incinerator building, Vaught's diversion of public employee labor came up during a conversation where Vaught was commenting on Elliott's work performance. Exhibit 1, Elliott Deposition at 39-42. During a second meeting, Vaught's alleged corruption was brought up as a collateral issue when Elliott complained how he was being treated unfairly compared to other Sanitation Authority employees. *Id.* at 42-43. On March 12, 2003, again Vaught's inappropriate use of public labor came up in the context of a disagreement that Elliott had about the number of vacation hours that he had accrued. *Id.* at 92-98.

The nexus of all three conversations in which Vaught's corruption was discussed, is that the issue of corruption was a collateral or peripheral matter to Elliott's main purpose for engaging in these confrontations; which was Elliott's own dissatisfaction with how he was treated compared to other employees. Elliott's accusations against Vaught always arose in the context of a public employee disgruntled with the preferential treatment of those employees that Vaught used for his own personal tasks, rather than Elliott, as a private citizen concerned with the misuse of public funds. Elliott's concern was not about corruption and the harm to society, but that his own work situation deteriorated because of Vaught's practices. *See Stroman*, 981 F.2d at 155-56 (stating that personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest fall outside of First Amendment protections

9

because they are not matters of public concern).

Certainly, there is validity to the contention that the revelation of Vaught's diversion of public employee labor brings a benefit to both society in general and to Elliott as an employee. Elliott would personally benefit because the unethical preferential treatment of certain employees would be discontinued. It is also possible that Elliott's knowledge of Vaught's misuse of public employee labor could be used as a bargaining chip in negotiating Elliott's status in the workplace. The end of public corruption, however, also inures a benefit to the public as a whole because the improper use of taxpayer dollars is eliminated. The distinction between whether speech is made in the role of an employee or as a private citizen is not bright line. The distinction is made more difficult when the speech benefits the party as an employee and as a private citizen. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000) ("The citizen-employee test can yield indeterminate results because the existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern.").

It may also seem counterintuitive and defy common sense to conclude that corruption is not a public concern. Certain Federal Circuit Courts of Appeal have stated that there are some topics that are inherently considered a public concern because of content. *See Johnson v. Multnomah County, Oregon*, 48 F.3d 420, 425 (9th Cir. 1995) ("Although [plaintiff] was embittered about not being promoted, her allegations did not concern the 'minutiae of workplace grievances' (citation omitted), but rather concerned information that is of inherent 'relevance to the public's evaluation of the performance of government agencies.'"). There is a certain appeal to such logic. The controlling precedent of the Fourth Circuit, however, clearly does not

10

Case 7:03-cv-00627-JCT   Document 21   Filed 10/20/05   Page 10 of 12   Pageid#: 310

countenance such an approach. "Content, subject matter, is always the central aspect," *Jackson v. Bair*, 851 F.2d 714, 720 (4th Cir. 1988), but the form and context of the speech are also material and relevant factors to consider.

The precedent of this Circuit makes clear that because Elliott's speech was overwhelmingly motivated by a grievance over his treatment in the workplace, and the issue of Vaught's corrupt practices and Elliott's concern for public graft were only tangential issues, his speech was not a public concern. *See Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (questioning whether plaintiff's speech that addressed evidence tampering allegation against high-ranking police officer was a matter of public concern because plaintiff's personal animosity motivated his conduct, which detracted from the plaintiff's professed interest in exposing official corruption); *Arvinger v. Mayor and City Council of Baltimore*, 862 F.2d 75 (4th Cir. 1988) (holding that police officer's statements were not a matter of public concern because they were not made to further public debate on employment discrimination, drug policy, or other public topics, but were made to further the interests of the officer and his co-employees); *see also Connick*, 461 U.S. at 148, (stating that certain segments of plaintiff's speech were not of a public concern because her speech was intended to "gather ammunition for another round of controversy with her superiors" and "reflect one employee's dissatisfaction with an [employment decision] and an attempt to turn that displeasure into a cause celèbre."); *Gillum v. City of Kerrville*, 3 F.3d 117, 120-21 (5th Cir. 1993) (holding that employee's speech about corruption was not a public concern because the focus of the analysis is not solely on the "inherent" importance of the subject matter and, in this case, the plaintiff was acting as an employee embroiled in a personal employment dispute); *McMurphy v. City of Flushing*, 802 F.2d 191, 197-

98 (6th Cir. 1986) (holding that trial court properly considered personal vendetta as basis for employee's speech, rather than a sincere effort to expose official corruption). Since Elliott's speech did not address a public concern, it is not protected by the First Amendment. Therefore, Elliott's claim under the First Amendment must fail.

**B.**

Elliott also asserts a claim of wrongful termination under Virginia state law. Since no claim under the Constitution or Federal law exists because the defendants' motion for summary judgment is granted as to the plaintiff's First Amendment claim, the Court declines to exercise supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367(c). Therefore, the state law claim is dismissed without prejudice.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: This 20th day of October, 2005.

James C. Turk
Senior United States District Judge

12

Case 7:03-cv-00627-JCT   Document 21   Filed 10/20/05   Page 12 of 12   Pageid#: 312